1   JON Y. VANDERPOOL, ESQ. (SBN 161611)
    KATHRYN A. SCHULTZ, ESQ. (SBN 272591)
2   JON CADIEUX, ESQ. (SBN 265155)
    SMITH, STEINER, VANDERPOOL
3       & WAX, APC
    401 West A Street, Suite 320
4   San Diego, CA 92101
    Telephone:  619-239-7200
5   Fax:  619-239-6048

6   Attorneys for Plaintiff
    MOHAMMED MOHIDEEN

7

8                  UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

10  MOHAMMED MOHIDEEN, an            )   CASE NO. 13-CV-0799-MMA-NLS
    individual,                      )
11                                   )   **FIRST AMENDED COMPLAINT**
                                     )   **FOR DAMAGES FOR:**
12             Plaintiff,            )
                                     )   (1)   Retaliation in Violation of the
13      v.                           )         FEHA [Cal. Gov't C. § 12940]
                                     )   (2)   Retaliation in Violation of Cal.
14  CALNET, INC., a Maryland         )         Labor Code § 1102.5
    corporation; KALEEM SHAH, an     )   (3)   Wrongful Termination in
15  individual,                      )         Violation of Public Policies
                                     )   (4)   Retaliation In Violation of the
16             Defendants.           )         False Claims Act [31 U.S.C. §
                                     )         3730(h)]
17  ―――――――――――――――――――――           )   (5)   Retaliation in Violation of the
                                         Major Fraud Act [18 U.S.C. §
18                                       1031(h)]
                                     (6)   Violation of Cal. Labor Code §
19                                       1050

20                    **DEMAND FOR JURY TRIAL**

21                          **PARTIES**

22      1.     MOHAMMED "Feizal" MOHIDEEN is a resident of California.  He was

23  Senior Vice President of West Coast Operations for Defendant CALNET, INC. from

24  November 2005 until he was fired in May 2011.

25      2.     CALNET, INC., is a privately-held Maryland corporation, headquartered in

26  Virginia,  which  provides  intelligence  analysis,  linguistic  services,  information

27  technology ("IT") consulting services, as well as global aviation and security services.

28  Although CALNET services both public agencies and private businesses, government

                                   -1-

entities comprise approximately 90% of its client base.  CALNET's primary place of business is located at 12359 Sunrise Valley Drive, Suite 270, in Reston, Virginia. CALNET's West Coast branch office is located at 9909 Mira Mesa Boulevard, Suite 110, in San Diego, California.

3.     Defendant Kaleem SHAH is a resident of Virginia, as well as the founder, Chief Executive Officer, President, and sole-shareholder of CALNET.  At all relevant times, SHAH had the authority to hire and fire CALNET employees, to direct their work assignments, and to oversee CALNET's business operations and financial dealings.

## VENUE

4.     This action arises from circumstances that occurred within the County of San Diego, California.  At all relevant times, Defendants conducted regular business transactions in San Diego County and maintained an office staffed with permanent employees in San Diego, California.  Accordingly, venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(1)-(3).

## JURISDICTION

5.     This Court has jurisdiction to hear this case under 28 U.S.C. § 1332, because the damages sought exceed the jurisdictional minimum of $75,000 and the parties are citizens of different states.

6.      MOHIDEEN filed a complaint with the Department of Fair Employment and Housing and received a "Right to Sue Letter" on April 29, 2012, thereby timely exhausting his administrative remedies.

## GENERAL ALLEGATIONS

### CALNET's Business Services and Clients

7.     Founded by SHAH in 1989, CALNET provides intelligence analysis, language services, IT consulting services, and global aviation and security services to government and commercial clients.  Among its clients are numerous United States government agencies and military commands, including the Department of Homeland

Security, the National Security Agency ("NSA"), the Transportation Security Agency, the U.S. Treasury, and U.S. Strategic Command.

8.   Initially focused on IT consulting and technology solutions, demand for CALNET's translation and interpretation support services increased with the United States' military involvement in Iraq and Afghanistan.  As part of CALNET's linguistic support program, CALNET provides U.S. military personnel with the opportunity to gain operational familiarity with the climate, culture, and customs of a foreign country prior to their actual deployment. CALNET trains and employs foreign-language-speaking "role-players" who serve as mayors, sheiks, battalion commanders, and civilians in mock "villages" erected on United States military bases.  CALNET aims to create a realistic simulation of the host-nation's environment in which soldiers are able to apply and refine their communication and intelligence gathering techniques.

**SHAH Recruits MOHIDEEN to Manage CALNET's San Diego Operations**

9.   In November 2005, CALNET opened its Western Regional office in San Diego, California.  To run CALNET's new branch office, SHAH appointed long-time acquaintance Feizal MOHIDEEN as Senior Vice President of West Coast Operations. MOHIDEEN and SHAH first met while the two attended graduate school at Clemson University in the mid-1980s.  They reconnected in the early-2000s when SHAH provided consulting services for MOHIDEEN's then-employer, Aeronautical Radio.  In April 2005, SHAH recruited MOHIDEEN to perform part-time work for CALNET, as an independent contractor, screening and recruiting linguists for CALNET's language support program.   When SHAH expanded CALNET from its Reston, Virginia headquarters, he wanted MOHIDEEN to run the day-to-day operations of his new branch office.  Accordingly, in November 2005, SHAH hired MOHIDEEN to a full-time salaried position as Senior Vice-President of West-Coast Operations.

10.   After accepting the new position with CALNET, MOHIDEEN hired a Director of Business Development and started setting up the new office.  As Senior Vice-President, MOHIDEEN's job responsibilities were numerous and diverse,

including customer service, program management, and proposal development. MOHIDEEN's primary role, however, was operations management, which entailed developing and supporting CALNET's commercial clients, recruiting consultants, overseeing and coordinating office employees, and generally serving as SHAH's "eyes and ears" in San Diego.  MOHIDEEN spoke with SHAH by telephone on a daily basis, oftentimes more than once, because SHAH insisted on approving any and all business decisions before implementation.

11.    CALNET thrived during MOHIDEEN's tenure as Senior Vice-President of Western Operations.  In 2006, CALNET received recognition from *Inc. Magazine* as one of America's fastest growing private companies.  That same year, CALNET also won several large government contracts, including the U.S. Army' Intelligence and Security Command's ("INSCOM's") "Operation Enduring Freedom" contract – a five-year project located in Guantanamo Bay, Cuba, worth up to $66 million.  MOHIDEEN also played an instrumental role in attracting commercial clients, obtaining a contract with Cricket Wireless in 2006 worth over $1 million.

12.    In November 2007, CALNET signed another INSCOM contract – the "Army Exercise Support" contract – a five-year, cost-plus-fixed-fee, indefinite delivery, indefinite quantity contract worth up to $104 million.  Pursuant to the agreement, CALNET provided linguistic training and support services for military training exercises, utilizing their "role-players" to create mock "villages" at the U.S. Army's National Training Center ("NTC") on the base at Fort Irwin ("Ft. Irwin"), California.

13.    In May 2008, after successfully running the San Diego branch office for nearly two and a half years, MOHIDEEN resigned from CALNET to spend time with his daughter before she left for college.  Approximately three months later, however, after his daughter left for school, SHAH rehired MOHIDEEN to his previous position as Senior Vice President of West Coast Operations.

14.    CALNET continued to prosper after MOHIDEEN's return, and the following years brought even more success for CALNET.  In 2009, the company won

several lucrative contracts and subcontracts from INSCOM, the U.S. Department of State, the Federal Aviation Agency, and the U.S. Armed Forces Afghanistan.  In 2010, one of CALNET's largest contracts was an indefinite quantity, indefinite delivery contract with a ceiling value of $492 million called "OMNIBUS III."   CALNET described its role as "support[ing] the U.S. Army's Intelligence and Security Command mission performance across all intelligence disciplines, leveraging strong relationships with every national intelligence agency, with physical and virtual presence in all theaters around the globe."

15.    In recognition of his efforts, running the San Diego Office and supporting CALNET's west-coast operations, CALNET awarded MOHIDEEN a significant merit-based raise in October 2010, increasing his annual salary from $120,000 to $160,000.

## SHAH Directs MOHIDEEN to Investigate Internal Complaints
## About Conduct at Fort Irwin

16.    Although CALNET's business flourished in 2009 and 2010, CALNET was also faced with some internal complaints from its employees and role-players working in conjunction with the "Army Exercise Support" program at Ft. Irwin, California.

17.    The majority of internal complaints involved alleged 'abuses of power' by Program Manager Shane Riley and Operations Manager Phil Calabria, who ran and oversaw work done at Fort Irwin.  Under CALNET's management structure, for matters directly related to the Army Exercise Support Program, Phil Calabria reported to Shane Riley, who in turn reported directly to Kaleem SHAH.  Although Mohideen oversaw the day-to-day operations of the San Diego office, his authority only extended to certain personnel issues and, even with regard to such matters, Riley and Calabria often corresponded directly with SHAH, either telling MOHIDEEN about the communication after-the-fact or bypassing him entirely.

18.    To fulfill the requirements of the government contract, CALNET linguist role-players were selected from an internally maintained spreadsheet of potential candidates, or from third-party employment sites (e.g. Monster.com), based upon the

particular linguistic and cultural requirements of each mission.  The role-players typically work in three-week rotations, living on the military base to which they have been assigned.  At the end of their rotation, the role-players' names are cycled back into CALNET's spreadsheet for future consideration.

19.    Riley and Calabria, as Program and Operations Managers respectively, had the ability to select and schedule CALNET's role-players, who worked as independent contractors, as well as to approve site-mangers' time-cards.  They also had the responsibility for selecting and overseeing the site-managers and role-players selected for each "mission" or training rotation.  As such, the Riley and Calabria wielded a significant amount of power and influence over the site staff, many of whom wanted to work more rotations.

20.    In or about February 2009, Senior Linguist Operations Manager Mohammed Saman complained to MOHIDEEN that Calabria had sexually harassed one of CALNET's role-players, offering to give her better and more-frequent rotations in exchange for sexual favors.  Shortly thereafter, site manager Robert Arredondo also filed an internal complaint against CALNET managers Riley and Calabria, alleging sexual harassment, discrimination, and retaliatory conduct.  MOHIDEEN raised these issues with SHAH, who instructed him, in conjunction with Human Resources ("HR") Manager Julie Gleba, to investigate the employee complaints and prepare a report of their findings.

21.    MOHIDEEN and Gleba interviewed more than a dozen role-player linguists, identifying several major issues regarding CALNET's managers.  Multiple employees complained about Calabria giving favorable rotations to female interpreters in exchange for sexual favors.  Others told MOHIDEEN that Riley was disrespectful to female employees and covered up role players' use of drugs and alcohol.  Numerous employees also expressed a reluctance to report such behavior to CALNET management because Riley, Calabria, or SHAH would punish them with fewer, less-favorable rotations or terminate their employment entirely.

22.   MOHIDEEN and Gleba updated SHAH and HR Director Melissa Robinson on their progress and findings throughout the investigation.  Once they had concluded their investigation, Gleba prepared a report of their findings and delivered it to SHAH, in person, in May 2009.  In their report, MOHIDEEN and Gleba determined that Riley and Calabria had violated CALNET's policies and their report recommended that CALNET: (1) meet with all managers to conduct anti-harassment and discrimination training; (2) ensure rotations are scheduled fairly; and (3) eliminate favoritism and retaliatory business practices.

23.   After receiving the report, SHAH ignored MOHIDEEN's and Gleba's recommendations and took no action against either Calabria or Riley.  According to SHAH, CALNET's clients liked Riley and Calabria and he did not want to risk upsetting them based upon complaints from role players who, in SHAH's opinion, were easily replaceable.

24.   Sometime in June 2009, less than a month after MOHIDEEN and Gleba submitted their report about Riley's and Calabria's mismanagement at Ft. Irwin, Arredondo told HR Manager Gleba that he had found drugs in one of the role-player's suitcases on the way to a work rotation. Gleba immediately contacted MOHIDEEN in San Diego, who investigated, and confirmed, that the role-player and her husband had attempted to bring hashish onto the military base at Ft. Irwin.

25.   At the time, MOHIDEEN was surprised that the drugs had not been detected sooner, since Riley had told him that all employees were screened using drug-sniffing dogs before being transported to the base.  When questioned him on this topic, Riley told MOHIDEEN that all the dogs were out on assignment and temporarily unavailable.  Suspicious of Riley's explanation, MOHIDEEN investigated the issue further and discovered that drug-sniffing dogs were available but were not used to screen incoming role-players or their luggage.  MOHIDEEN also discovered other inconsistencies with Riley's assertions, including the fact that he was not a certified "Project Management Professional" as his job application stated.  Shortly thereafter,

MOHIDEEN learned that Riley threatened to fire Senior Linguist Operations Manager Saman in retaliation for his reporting of Riley's conduct at Ft. Irwin earlier in the year.

26.   In response to Riley's misconduct, his misrepresentations, and threats against Saman's employment, MOHIDEEN and HR Director Robinson prepared a letter of reprimand and gave it to SHAH for approval and inclusion in Riley's personnel file. SHAH, however, refused to sign off on the reprimand and again assured MOHIDEEN that Riley was a good employee and his involvement in any wrongdoing was just a big misunderstanding.

27.   CALNET fired Arredondo in August 2009 for purported misuse of his company-issued cell-phone.  Shortly thereafter, SHAH directed Riley and Gleba to terminate Mohammed Saman's employment, which they did in September 2009, under pretext of company "downsizing."  Riley is still employed by CALNET.

### SHAH Directs MOHIDEEN to Assist with CALNET's Defense to Lawsuits Filed by Former Employees

28.   Despite SHAH's attempts to reassure MOHIDEEN that the employee complaints were "just noise" that would "blow over," former CALNET Administrative Assistant Leana Riscol filed a lawsuit in early 2010, alleging sexual harassment and retaliation by CALNET and Shane Riley.

29.   After receiving Riscol's deposition subpoena, SHAH designated MOHIDEEN as CALNET's custodian of records and directed him to testify on CALNET's behalf at the noticed deposition in June 2010.  Before the deposition, SHAH instructed MOHIDEEN to be a "team player" and refrain from "bad-mouthing" Riley during the deposition.  Although MOHIDEEN did not have a high opinion of RILEY after his 2009 investigation of Arredondo's complaint, MOHIDEEN believed SHAH's representation that Riley had done nothing wrong in connection with Riscol and, consequently, MOHIDEEN did not volunteer his misgivings about Riley during the deposition.

30.   In August 2010, SHAH gave MOHIDEEN access to CALNET's electronically stored records – referred to internally as the "test1 account" – and asked him to identify and quarantine any e-mails related to Riscol's allegations. MOHIDEEN complied, reviewing e-mail exchanges between CALNET employees from the previous two years.

31.   In November 2010, SHAH told MOHIDEEN that former site-manager Arredondo had also filed a lawsuit against CALNET for retaliation and wrongful termination.   SHAH told MOHIDEEN that Arredondo's complaint had no merit and asked MOHIDEEN to expand his review of the "test1 account" to include any documents relevant to Arredondo's allegations.

**MOHIDEEN's Review of Server Documents Raises His Suspicions About CALNET's Conduct and He Confronts SHAH Twice in 2010**

32.   In mid-October 2010, while examining CALNET's computer server data as instructed by SHAH, MOHIDEEN discovered an email from Riley to SHAH, confirming SHAH's directive to add hours to former CALNET employee Kerry Superville's timecard past the date of her termination from employment. To MOHIDEEN, it appeared that CALNET had charged the government for two weeks' of work that Superville did not actually perform.

33.   CALNET tracks employee work hours through its internal time-management system, called UNANET.  Employees enter the time they work each day under the appropriate project code, which is then verified by the employee's supervisor and, eventually, for those employees working on the Exercise Support Program at Ft. Irwin, by Program Manager Riley.  CALNET relies on the UNANET data to pay employees and bill the government for work performed.  Once a particular rotation was complete, timecards would be submitted and the government would be billed for the actual time worked.

34.   Because Riley's email seemed suspicious, MOHIDEEN called SHAH at CALNET's Virginia office and insisted that he be allowed to confront Riley about what

appeared to be time card fraud.  SHAH told MOHIDEEN not to question Riley, and that he would take care of it himself.

35.    In November 2010, MOHIDEEN discovered another email from Riley to Operations Manager Calabria, and Site Managers Arredondo and Hill, instructing them to alter employee UNANET entries charged to the INSCOM project.  Because the contract's task orders required work to be completed during specific "periods of performance," Riley directed the Operations Managers to redistribute hours charged outside the performance period to days that fell within the performance period, or to bill the time to a different performance period altogether.

36.    A few weeks later, MOHIDEEN again confronted SHAH about these irregularities, this time in person while SHAH was visiting San Diego.  MOHIDEEN insisted that Riley's conduct be addressed.  MOHIDEEN told SHAH that Riley's actions were fraudulent and criminal.  SHAH again assured MOHIDEEN that no harm had been done, and that MOHIDEEN simply did not understand government contracts. Although skeptical, MOHIDEEN deferred to SHAH's superior knowledge of the legal or regulatory standards applicable to the government contracts.

37.    While gathering documents for the ongoing litigation, MOHIDEEN also came across an email that he had originally received from Melissa Robinson in June 2009.  Robinson's email asked that he, SHAH, Gleba, and Senior Vice-President Helena Robinette keep complaints made by former CALNET employee Patrick Shakarjian against Riley and Calabria confidential. Robinson worried that Riley and Calabria would retaliate against Shakarjian if they knew he had reported them.  SHAH fired Patrick Shakarjian in September 2009.  As with Saman's termination, SHAH told Shakarjian that he was being let go because the company was downsizing.

38.    When MOHIDEEN voiced concerns to SHAH about suspected retaliation, SHAH responded that the lawsuits and complaints were "just noise" from disgruntled employees.    SHAH also said that there was insufficient evidence of Riley's or Calabria's culpability in the alleged lawsuits.  SHAH again assured MOHIDEEN that

1  Arredondo's complaint had no merit and that CALNET terminated his employment

2  because of his persistent use of CALNET's cell-phone for personal calls.

3       39.    Although his trust in SHAH had started to erode, MOHIDEEN again

4  deferred to SHAH's explanation that Arredondo had been fired for good cause.

5  **SHAH Expands MOHIDEEN's Review To Include Search and Destruction of**

6  **"Damaging" Emails Responsive to a DOD Subpoena**

7       40.    Sometime in December 2010, SHAH emailed MOHIDEEN's personal

8  email account to inform him of a lawsuit filed by CALNET's former Chief Financial

9  Officer ("CFO") Kimthy Chao.  After leaving CALNET in September 2010, he had

10  alerted authorities to irregularities in CALNET's bookkeeping, which prompted the

11  Department of Defense ("DOD") to initiate an investigation.  Upon receipt of the

12  DOD's records subpoena and electronic systems information ("ESI") preservation

13  notice, SHAH emailed MOHIDEEN, instructing him to remove any damaging emails

14  from CALNET's computer servers and hard-drives before copying the systems data for

15  the DOD.  Although MOHIDEEN did not delete any emails from CALNET's servers or

16  hard-drives, he told SHAH that he had "cleaned" the system as instructed.

17       41.    As he continued to review CALNET emails on the "test-1 account,"

18  MOHIDEEN found additional examples of time card fraud.  By comparing emails

19  regarding employee schedules to the UNANET time card entries, MOHIDEEN

20  discovered that CALNET's managing agents had altered the employees' entries to add

21  hours to certain days or times the employees were not at work.

22       42.    MOHIDEEN also found emails from several CALNET employees,

23  complaining about management's directions to alter timecards.  For example, former

24  CALNET employee Taria Danh had emailed CALNET Operations Manager Philip

25  Calabria several times, protesting "the timekeeping policy."  Danh said that she had

26  previously been warned about "fraudulently logging" her hours and did not feel

27  comfortable lying about the hours she worked, the projects they relate to, or the days on

28

which she worked them.  Danh also protested Calabria's failure to reprimand a site manager for turning in forged timecards.

43.    MOHIDEEN also discovered emails and invoices, confirming that between early 2009 and 2010, CALNET paid SHAH's sister, Nusrath Unisa, over $500,000. MOHIDEEN was shocked that CALNET had paid her such a large sum of money to simply upload and update resumes of potential linguists to CALNET's internal database of available candidates (WEBPASS).  Based upon MOHIDEEN's prior experience with WEBPASS, he believed Unisa's responsibilities required only part-time work but, according to her invoices, she billed CALNET for a full 40 hours a week, every week. Given his understanding of her data-entry role, MOHIDEEN felt that SHAH's payments to his sister were improper.  MOHIDEEN also suspected her signatures on the three independent contractor agreements that governed her employment had been forged.  In fact, MOHIDEEN noted on one of the agreements, Unisa's signature was misspelled.

**MOHIDEEN Confronts SHAH Again, in February 2011, About**
**CALNET's Employment and Billing Practices**

44.    A few weeks later, in February 2011, SHAH told MOHIDEEN that he wanted to fire CALNET employee Chris Blaisol over an email in which Blaisol requested additional transportation for role-players and complained that other employees had not made similar requests because they feared SHAH would fire them for expressing concerns about the way CALNET is run.  MOHIDEEN, however, told SHAH that he cannot retaliate against employees for raising legitimate concerns about CALNET's management or operations.

45.    SHAH's stated desire to terminate Blaisol, spurred MOHIDEEN to again confront SHAH about CALNET's employment and billing practices.  In addition to Blaisol's situation, MOHIDEEN also discussed his concerns about the amount paid to SHAH's sister and the suspicious signatures on her consultant contracts.  MOHIDEEN asked SHAH how he could justify paying his sister over $300,000 on a single invoice and expressed his belief that the payments inflated the amount CALNET charged the

government in overhead costs, thereby reducing the company's reported income for tax purposes and interfering with the accuracy of CALNET's cost accounting rates.  SHAH denied any wrongdoing and ignored MOHIDEEN's questions and concerns.

**MOHIDEEN Uncovers CALNET's Retaliation Against Arredondo and Submission of a False Investigatory Report to the Government**

46.    Toward the end of February 2011, as part of the Arredondo lawsuit, MOHIDEEN asked Riley about the basis for his conclusion that Arredondo had misused his company cell phone.  In response, Riley showed MOHIDEEN an email chain between him and SHAH, which Riley had not turned over for production as part of Arredondo's discovery requests.  Riley told MOHIDEEN he did not want Arredondo's lawyers to have this document, since it would be damaging to CALNET's defense of the suit.  According to the email chain, Riley suggested pulling Arredondo's phone records to determine whether and when he spoke with certain CALNET employees, including Fenik Khoshnaw, Saman Mohammed, Zhyan Hesen, and Bryan Forte, all of whom filed lawsuits against CALNET after SHAH terminated their employment.  Although Riley's search of Arredondo's phone records did not support Riley's theory that Arredondo had been helped former CALNET employees in their lawsuits against the company, it did reveal several personal calls originating from Arredondo's company cell phone, which Riley and SHAH used as a pretext to fire him.

47.    Given this revelation, MOHIDEEN again searched the "test1 account" for more communications between SHAH and Riley about Arredondo's termination.  MOHIDEEN found other emails documenting Riley's request to remove Arredondo and rotate another CALNET employee, Mohammed Saman, "to another program" because the two had assisted with MOHIDEEN's investigation of conduct in Ft. Irwin back in 2009.  According to Riley, Arredondo and Saman had "stabbed him in the back" by complaining about his misconduct.  MOHIDEEN then realized that SHAH had concealed the real reasons for Arredondo's termination, which is why he directed

MOHIDEEN to verify Special Interrogatory responses saying that MOHIDEEN had made the decision to fire Arredondo.

48.    Less than two weeks later, in early March 2011, MOHIDEEN was scheduled to travel to Virginia to testify as CALNET's custodian of records for a deposition in Arredondo's lawsuit.  The deposition was ultimately cancelled, but not before MOHIDEEN spoke with two other CALNET employees about his growing suspicion that Arredondo may not have been fired for lawful reasons.

49.    One of these employees was HR Manager Gleba, who had helped MOHIDEEN investigate Arredondo's allegations and prepare the May 2009 report. MOHIDEEN knew that Arredondo, after his termination, told INSCOM representatives that CALNET employees had brought drugs onto the Ft. Irwin military base and covered up sexual harassment complaints.  Accordingly, INSCOM contacted SHAH and requested a copy of the investigation report MOHIDEEN and Gleba had compiled. Although MOHIDEEN personally delivered the report to the INSCOM representative in San Diego, he did not know that SHAH had revised portions of the report before giving it to MOHIDEEN for transmittal.  According to Gleba, SHAH had removed the findings in their original report, which documented credible testimony about Calabria's and Riley's abuses of power.  The altered report dismissed the complaints as attempts by linguists "desperate to get work" to influence CALNET's rotation schedule.  Notably, the altered report stated that none of the role-players confirmed any of the sexual harassment allegations levied against Calabria.  Both MOHIDEEN and Gleba knew SHAH's revisions contradicted the testimonial evidence contained in the original report that Calabria gave favorable rotations to specific role-players in exchange for sexual favors.

50.    MOHIDEEEN also spoke with CALNET HR Director Robinson, who was afraid that she might be asked about her own time card entries during her deposition. She told MOHIDEEN that SHAH had created and distributed an "hours allocation spreadsheet," directing specific employees working on the Exercise Support project how

1   to record their time.  Robinson told MOHIDEEN that if she did not enter her hours

2   exactly as SHAH directed, even when they did not reflect the actual hours she worked,

3   he would refuse to approve her time card.

**MOHIDEEN Confronts SHAH for a Fourth Time**

4

5   51.    After learning that SHAH altered the INSCOM report, and finding the

6   email chain between Riley and SHAH evidencing their plans to fire Arredondo,

7   MOHIDEEN confronted SHAH for a fourth time in March 2011.  SHAH denied

8   altering the report and assured MOHIDEEN that the copy sent to the government was

9   exactly the same as the version he and Gleba had written in May 2009.  MOHIDEEN

10  told SHAH that he believed CALNET had engaged in time card fraud, and that he

11  believed SHAH fired Arredondo and others in retaliation for whistle-blowing.  SHAH's

12  reply again, was to say the emails MOHIDEEN found were all "noise" and "it will all

13  go away."

14  52.    MOHIDEEN also told SHAH about his conversation with Robinson and

15  how she said that SHAH refused to approve her timecards unless she wrote in the hours

16  he told her to, rather than the time she actually worked.  SHAH told MOHIDEEN that

17  Robinson was an "idiot," and that he only hired her because she was black.

18  53.    A few weeks later, SHAH called MOHIDEEN and said that he had reduced

19  the salary of CALNET's Senior Vice-President of Business Development and, for

20  appearances sake, would have to reduce MOHIDEEN's salary as well.  But SHAH

21  explained that he would personally make up the difference so, at the end of the day,

22  MOHIDEEN would still receive his full $160,000 salary.  SHAH just wanted it to look

23  as though MOHIDEEN also took a pay cut to avoid the appearance of favoritism.

24  SHAH followed through on his promise, sending MOHIDEEN a personal check in

25  April 2011 for $2,337.55, the difference in his monthly salary after the illusory

26  reduction.

27  ///

28  ///

**MOHIDEEN Reports Suspicions that CALNET Defrauded the Government to U.S. Attorney and Objects to CALNET's Defense to Arredondo's Lawsuit**

54.    After MOHIDEEN confronted SHAH in March 2011, he realized that SHAH had known about and/or orchestrated CALNET's improper activities.  Realizing that continued protests to SHAH were futile, MOHIDEEN contacted a criminal defense attorney, who in turn contacted the U.S. Attorney General's ("AG") office on April 1, 2011.  After a series of conference calls between the FBI and AG, MOHIDEEN turned over all of the information he had discovered related to CALNET's fraudulent billing and timecard manipulation activities.

55.    MOHIDEEN exchanged a series of emails with SHAH in late-April 2011 about his having met with a criminal defense attorney.

56.    SHAH called MOHIDEEN on May 3, 2011 to discuss MOHIDEEN's ongoing protests.  MOHIDEEN told SHAH about the evidence he uncovered that proved CALNET engaged in retaliatory firings and fraudulent billing practices.  He also told SHAH that he knew SHAH had misrepresented the reasons for Arredondo's termination and said that, if deposed, he would testify truthfully about having nothing to do with Arredondo's firing.

**SHAH Fires MOHIDEEN**

57.    That same day, MOHIDEEN learned that $4,500 had inexplicably been deposited into his bank account by CALNET.  He immediately called CALNET's finance director and asked how to return the money.

58.    Although CALNET did not get back to him about the $4,500 until May 7th, SHAH did call MOHIDEEN back on May 3rd to say that he had to stop payment on the $2,337.55 check he had written to MOHIDEEN on April 27, 2011, to cover the illusory salary reduction.

59.    MOHIDEEN also received a visit from a representative from ADT security on May 3rd, who said he received a request to reset the passwords to CALNET's alarm system.  The representative said CALNET told him that they were hiring a new Office

Manager for their San Diego office and needed to update the codes.  MOHIDEEN had not heard anything about this plan from SHAH.

60.   Over the next week, SHAH sent MOHIDEEN a series of emails, invoking their long-standing relationship and reassuring MOHIDEEN that there was no "conspiracy" to fire him.  SHAH promised to fly to San Diego so he and MOHIDEEN could settle their dispute "like men."

61.   On May 9, 2011, MOHIDEEN responded to SHAH's emails, thanking SHAH for hiring him at CALNET but lamenting the ways and means by which SHAH made MOHIDEEN an unwitting participant in CALNET's course of conduct. MOHIDEEN told SHAH that he knew that SHAH covered up Riley's and Calabria's sexual misconduct and fired at least four different employees because they spoke out against Riley's and Calabria's behavior.

62.   On May 10, 2011, MOHIDEEN responded to an e-mail from SHAH, recounting the reasons why CALNET's conduct was illegal.  Less than two hours later, SHAH called MOHIDEEN and fired him, but not before accidentally copying him on an e-mail that confirmed SHAH had intended to fire MOHIDEEN on May 3rd.  The "new manager" the ADT security representative mentioned was actually MOHIDEEN's replacement and the $4,500 that CALNET deposited in his account was intended to be his final paycheck, including payment for his accrued paid-time-off.

63.   According to the separation letter he sent MOHIDEEN later that day, SHAH said he fired MOHIDEEN because of dissatisfaction over MOHIDEEN's business development efforts, despite the fact that, as Vice-President of West Coast Operations, business development was only a minor aspect of MOHIDEEN's job responsibilities.

64.   Prior to the termination notice, MOHIDEEN had not been criticized regarding his job performance.  For that and a host of other reasons, it was evident that SHAH terminated MOHIDEEN because he opposed SHAH's and CALNET's pattern of

1   unlawful employment and business practices, including efforts to unlawfully conceal

2   those practices in civil discovery proceedings.

3        65.    After 26 years of friendship and more than five years of dedicated service,

4   MOHIDEEN was escorted off CALNET's premises in full view of his office colleagues

5   and peers.

6   **MOHIDEEN is Deposed in Arredondo's Lawsuit**

7        66.    MOHIDEEN was deposed by Arredondo's attorneys on August 8, 2011.

8   He explained that contrary to SHAH's testimony and CALNET's verified responses to

9   Arredondo's Special Interrogatories, SHAH made the decision to terminate Arredondo.

10  MOHIDEEN also testified about the emails he found during his review of the test1

11  account, his confrontations with SHAH, and his belief that CALNET had withheld

12  discoverable evidence.  MOHIDEEN also testified that he had been in contact with the

13  U.S. Attorney General regarding his belief that CALNET and SHAH had violated

14  Federal law.  CALNET settled Arredondo's suit shortly after MOHIDEEN's deposition.

15       67.    On August 24, 2011, CALNET and SHAH placed an Incident Report in

16  MOHIDEEN's file with the Defense Industrial Security Clearance Office, falsely stating

17  that he had illegally accessed emails and misused information technology systems.

18  **<u>FIRST CAUSE OF ACTION</u>**

19  **<u>Retaliation in Violation of the California Fair Employment and Housing Act</u>**

20  **<u>[Gov't Code § 12940(h)] Against Defendant CALNET</u>**

21       68.    MOHIDEEN incorporates by reference paragraphs 1 through 67, as if fully

22  set forth herein.

23       69.    California's Fair Employment and Housing Act ("FEHA"), Government

24  Code §§ 12920 *et seq*., prohibits any person from retaliating against employees for

25  opposing practices forbidden by the Act, or for filing a complaint, testifying, or assisting

26  in any proceeding under the FEHA.  Cal. Gov. Code § 12940(h).  FEHA also mandates

27  that employers take all reasonable steps necessary to prevent retaliation.  Cal. Gov.

28  Code § 12940(k).

70.     While doing the acts alleged herein, CALNET regularly employed more than five people and met FEHA's definition of "employer."   Cal. Gov. Code § 12926(d); 2 Cal. Code Regs § 7286.5(a)(4).

71.     As detailed in paragraphs 1 through 67 above, Defendant CALNET engaged in unlawful retaliation against MOHIDEEN in response to his protests of, and refusal to participate in, what he reasonably believed to be violations of the FEHA. Because of MOHIDEEN's repeated protests of CALNET's harassing, discriminatory, and/or retaliatory practices that violated the FEHA, and his refusal to further perjure himself on behalf of CALNET in defense of Arredondo's FEHA lawsuit, CALNET fired him.  CALNET's sole shareholder, President, and CEO SHAH made the decision to fire MOHIDEEN for retaliatory purposes, to prevent MOHIDEEN's cooperation with a FEHA investigation, and to silence him from disclosing the evidenced wrongdoing of CALNET's managing agents.

72.     MOHIDEEN exhausted his administrative remedies before commencing this civil suit by filing a verified complaint with the Department of Fair Employment and Housing (DFEH) and obtaining a right-to-sue notice on April 29, 2012.

73.     MOHIDEEN has suffered and continues to suffer economic losses, including past and future earnings, and fringe benefits, as a result of Defendant's retaliatory conduct.   MOHIDEEN has also incurred costs and attorneys' fees in connection with his attempt to remedy Defendant's unlawful retaliation for which he will seek recovery pursuant to California Government Code § 12965(b).

74.     In committing the acts alleged herein, Defendants acted with conscious disregard for MOHIDEEN's rights, intending to vex, harass, annoy, and injure him, entitling MOHIDEEN to an award of punitive damages against CALNET, in an amount proportionate to their relative wealth, sufficient to punish and deter their future misconduct.

///

**SECOND CAUSE OF ACTION**

**Retaliation for Refusing to Commit Illegal Act [Labor C. § 1102.5]**

**Against Defendant CALNET**

75.     MOHIDEEN incorporates by reference paragraphs 1 through 74, as if fully set forth herein.

76.     Pursuant to California Labor Code § 1102.5(c), an employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

77.     As detailed in paragraphs 1 through 67 above, CALNET engaged in unlawful retaliation against MOHIDEEN for his protests and refusal to participate in conduct that violated both state and federal laws.  Between August 2010 and April 2011, MOHIDEEN uncovered evidence of CALNET's managing agents' retaliatory and harassing behavior in violation of FEHA, confronting the company's most senior executive and owner, SHAH, after each discovery.  Between November 2010 and April 2011, MOHIDEEN also confronted SHAH with evidence that CALNET violated federal laws and regulations by manipulating employee timecards, charging for work not actually performed, and by artificially inflating overhead costs.  MOHIDEEN told SHAH that these actions could expose CALNET, SHAH, and possibly other CALNET executives to potential criminal prosecution or civil liability.  CALNET terminated MOHIDEEN as a result of MOHIDEEN's refusal to perjure to himself in furtherance of CALNET's defense to a FEHA lawsuit, his repeated protests of fraudulent billing practices, his refusal to assist in SHAH's obstruction of justice in response to a DOD investigation, and his disclosure consulting with a criminal defense attorney in April 2011.

78.     MOHIDEEN exhausted his administrative remedies before commencing this civil suit by filing a verified complaint with the Department of Fair Employment and Housing (DFEH) and obtaining a right-to-sue notice on April 29, 2012.

79.     As a result of CALNET's conduct, MOHIDEEN suffered and continues to suffer economic losses, including past and future earnings, and fringe benefits. MOHIDEEN has also incurred costs and attorneys' fees in connection with his attempt to remedy Defendants' unlawful retaliation for which he will seek recovery pursuant to California Labor Code § 1105.  MOHIDEEN is also entitled to the maximum civil penalty pursuant to Cal. Labor Code § 1102.5(f) for each violation by CALNET.

80.     In committing the acts alleged herein, Defendants acted with conscious disregard for MOHIDEEN's rights, intending to vex, harass, annoy, and injure him, entitling MOHIDEEN to an award of punitive damages against CALNET, in an amount proportionate to its relative wealth, sufficient to punish and deter their future misconduct.

### THIRD CAUSE OF ACTION

### Wrongful Termination in Violation of Public Policy

### Against Defendant CALNET

81.     MOHIDEEN incorporates by reference paragraphs 1 through 80, as if fully set forth herein.

82.     California's public policy limits an employer's right to terminate an employee "at will" because the threat of termination could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public good.  *Foley v. Interactive Data Corp.*, (1988) 47 Cal. 3d 654, 665.  Similarly, public policy prohibits an employer from retaliating against an employee for opposing, reporting, or refusing to further an employer's unlawful purpose.  See e.g., *Tameny v. Atlantic Richfield Co.*, (1980) 27 Cal. 3d 167.

83.     At all times relevant, MOHIDEEN was an employee of CALNET, and SHAH by virtue of his status as president, CEO, and sole shareholder of the company.

84.    CALNET and SHAH terminated MOHIDEEN's employment because he protested and refused to participate in and/or ratify:

- the harassing and retaliatory conduct of CALNET managing agents in violation of Cal. Govt' Code § 12940, subds. (h) and (k);

- unlawful directives from SHAH in violation of Cal. Labor Code §§ 1102.5(c) and 2856;

- CALNET's fraudulent billing practices, and the investigation thereof, in violation of the federal False Claims Act [31 U.S.C. § 3729 *et seq.*], the Major Fraud Act [18 U.S.C. § 1031], and the False Statements Act [18 U.S.C. § 1001 *et seq.*], and Federal Acquisition Regulations [48 C.F.R. § 1.101 *et seq.*]

85.    These laws and regulations express fundamental public policies – to protect employees from workplace harassment, the U.S. government and taxpayers from billing fraud by government contractors, and to quell obstruction of the effectiveness of investigations and enforcement measures attendant to these policies.

86.    As a result of CALNET's conduct, MOHIDEEN suffered and continues to suffer economic losses, including past and future earnings, and fringe benefits. MOHIDEEN has also incurred costs and attorneys' fees in connection with his attempt to remedy CALNET's unlawful conduct.

87.    In committing the acts alleged herein, Defendants acted with conscious disregard for MOHIDEEN's rights, intending to vex, harass, annoy, and injure him, entitling MOHIDEEN to an award of punitive damages against CALNET, in an amount proportionate to its relative wealth, sufficient to punish and deter their future misconduct.

///

///

///

///

///

## FOURTH CAUSE OF ACTION

### Retaliation in Violation of the False Claims Act [31 U.S.C. § 3730(h)]

### Against Defendant CALNET

88.   MOHIDEEN incorporates by reference paragraphs 1 through 87, as if fully set forth herein.

89.   As detailed in paragraphs 1 through 67 above, CALNET engaged in conduct that violates the federal False Claims Act's "whistle-blower" protection provision [31 U.S.C. § 3730(h)] by firing MOHIDEEN in retaliation for his repeated protests of CALNET's false or fraudulent claims submitted to the government for payment, and MOHIDEEN's failure to assist SHAH's efforts to obstruct an ongoing investigation into the false claims by the DOD.   MOHIDEEN confronted SHAH on numerous occasions regarding evidence that false claims were submitted to the government for payment, characterizing CALNET's conduct as "illegal" and suggested that the government and legal counsel become involved.   With knowledge that MOHIDEEN suspected CALNET's unlawful billing practices, that he had been investigating the "test1 account" and CALNET's server documents for evidence to support it, and that he did not destroy the documents in question as SHAH requested, SHAH, CALNET's President and CEO, terminated MOHIDEEN shortly after learning MOHIDEEN met with an independent criminal defense attorney in April 2011.

90.   As a result of CALNET's conduct, MOHIDEEN suffered and continues to suffer economic losses, including past and future earnings, and fringe benefits.   For CALNET's conduct in violation of the False Claims Act, MOHIDEEN is entitled to recover two times the amount of back-pay, with interest.   37 U.S.C. § 3720(h)(2). MOHIDEEN is also entitled to recover all litigation costs and reasonable attorney fees pursuant to 37 U.S.C. § 3730(h)(2).

///

///

///

# FIFTH CAUSE OF ACTION

## Retaliation in Violation of the Major Fraud Act [18 U.S.C. § 1031(h)]

## Against Defendant CALNET

91.    MOHIDEEN incorporates by reference paragraphs 1 through 90, as if fully set forth herein.

92.    As detailed in paragraphs 1 through 67 above, CALNET engaged in conduct that violates the federal Major Fraud Act's "whistle-blower" protection provision [18 U.S.C. § 1031(h)] by firing MOHIDEEN in retaliation for his repeated protests of CALNET's intentionally false or fraudulent claims submitted to the government for payment, and MOHIDEEN's failure to assist SHAH's efforts to obstruct an ongoing investigation into the false claims by the DOD.   MOHIDEEN confronted SHAH on numerous occasions regarding evidence that false claims were submitted to the government for payment, characterizing CALNET's conduct as "illegal" and suggested that the government and legal counsel become involved.  With knowledge that MOHIDEEN suspected CALNET's unlawful billing practices, that he had been investigating the "test1 account" and CALNET's server documents for evidence to support it, and that he did not destroy the documents in question as SHAH requested, SHAH, CALNET's President and CEO, terminated MOHIDEEN shortly after learning MOHIDEEN met with an independent criminal defense attorney in April 2011.

93.    As a result of CALNET's conduct, MOHIDEEN suffered and continues to suffer economic losses, including past and future earnings, and fringe benefits.  For CALNET's conduct in violation of the Major Fraud Act, MOHIDEEN is entitled to recover two times the amount of back-pay, with interest.  18 U.S.C. § 1031(h)(2).  MOHIDEEN is also entitled to recover all litigation costs and reasonable attorney fees pursuant to 18 U.S.C. § 1031 (h)(2).

///

///

# SIXTH CAUSE OF ACTION

## Preventing Re-Employment by Misrepresentation ("Blackballing")

## [Cal. Lab. Code § 1050]

## Against Defendant CALNET and SHAH

94.    MOHIDEEN incorporates by reference paragraphs 1 through 93, as if fully set forth herein.

95.    More than three months after firing MOHIDEEN, Defendants CALNET and SHAH filed an "Incident Report" with the Defense Industrial Security Clearance Office ("DISCO") on August 24, 2011, accusing MOHIDEEN of "personal misconduct and misuse of information technology systems."

96.    DISCO is a government agency that facilitates issuance and oversight of personnel security clearances for DOD contractors.  A personnel security clearance is an administrative determination, made by a trained adjudicator, that an individual is eligible to receive access to classified information under national security standards. Upon receiving an applicant's request for clearance and completed personnel security background investigation, DISCO will issue the appropriate clearance on behalf of the DOD.

97.    DISCO, through the Joint Personnel Adjudication System ("JPAS"), also maintains records of personnel security clearances.  Upon receiving an incident report from a DOD contractor, an adjudicator will review the report and determine if the incident warrants investigation or revocation of the personnel security clearance. Incident reports become part of the individual's personnel security clearance file and may be used in connection with applications for renewed or enhanced clearances.

98.    The allegations contained in Defendants' incident report regarding MOHIDEEN are untrue.

99.    Defendants CALNET and SHAH submitted the incident report intending to preclude MOHIDEEN's ability to receive security clearances and prevent him from obtaining future employment.

100.   Defendants submitted the misrepresentations contained in the incident report of their own volition, without a special request to do so, which constitutes *prima facie* evidence that CALNET and SHAH violated California Labor Code, section 1050, pursuant to California Labor Code section 1053.

101.   As a result of CALNET's conduct, MOHIDEEN suffered and continues to suffer economic losses, including lost earnings, business opportunities, and fringe benefits.  For CALNET's conduct in violation of California Labor Code, section 1050, MOHIDEEN is entitled to recover treble damages under California Labor Code section 1054.


WHEREFORE, MOHIDEEN prays for judgment as follows:

1.   For past and future economic damages according to proof against Defendant CALNET and SHAH;

2.   For prejudgment interest against CALNET and SHAH;

3.   For reasonable attorney fees against CALNET and SHAH;

4.   For costs of suit against CALNET and SHAH;

5.   For such other and further relief against CALNET and SHAH as this Court deems just and proper.


Dated:  June 24, 2013          SMITH, STEINER, VANDERPOOL
                                & WAX, APC

                         By:    s/ Jon Y. Vanderpool
                                Jon Y. Vanderpool
                                Email:  jvanderpool@ssvwlaw.com
                                Kathryn A. Schultz
                                Jon C. Cadieux
                                Attorneys for Plaintiff

///

///

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all causes of action.

Dated:  June 24, 2013                           s/ Jon Y. Vanderpool
                                                Jon Y. Vanderpool
                                                Email:  jvanderpool@ssvwlaw.com
                                                Attorneys for Plaintiff